JESSE FROEHLICH, Respondent, *v.* MORRIS FROEHLICH and Another, Appellants.

First Department, May 10, 1929.

*I. Maurice Wormser* of counsel [*Sydney W. Stern* with him on the brief; *Stern & Marks*, attorneys], for the appellants.

*Gustave B. Garfield* of counsel [*Maurice V. Seligson* with him on the brief; *Simon M. Sapinsky*, attorney], for the respondent.

FINCH, J. From a judgment at law, entered upon the verdict of a jury, the defendants appeal.

The action is upon an alleged oral express contract of contribution between joint makers of nine of a larger series of promissory notes. Plaintiff and defendants, being partners in business and also having an equal stock ownership in a corporation known as Times Square Automobile Company, through which most of their business was conducted, in 1913 jointly acquired by assignment a leasehold on premises which, so far as required, they used for their business and rented out the balance, paying for this purchase by jointly signing twenty-four promissory notes, each in the sum of $14,825, to one Swetland, maturing semi-annually over a period of twelve years, the maturity date of the last note being coincident with the expiration of the leasehold, there being, however, certain rights of renewal. Plaintiff and defendant Froehlich are brothers, and

defendant Mansbach a close business associate. At the time of acquisition the leasehold was subject to an outstanding bond issue of $200,000. These bonds were owned by Swetland and followed the assignment of the leasehold and became the property of plaintiff and defendants, and were deposited with Swetland as collateral security for the payment of the twenty-four notes. In addition to acquiring the leasehold, the parties desired the erection of a larger building for the use of the corporation. Swetland at the time of the assignment loaned $40,000 for the construction of two additional stories on one of the buildings and the parties executed a $40,000 second mortgage, which was likewise held by Swetland. In 1916 the lease was formally assigned by plaintiff and the defendants to the Times Square Automobile Company, the latter assuming, in writing, all of the obligations of the individuals and agreeing to pay the notes in question and to hold plaintiff and defendants free and harmless from all liability or obligation arising from these notes. Thus as between the makers and the corporation the latter became primarily obligated to pay these notes. In 1916 the Times Square Automobile Supply Co., Inc., was formed for the purpose of taking over the Times Square Automobile Company and its various subsidiaries with the assets and liabilities of these corporations. Coincidentally with the formation of the supply company, Messrs. Wollenberger & Co., of Chicago, as bankers, floated an issue of preferred stock, receiving certain shares of common stock as a bonus. As a basis for the flotation of this issue of preferred stock, the accountants certified that the leasehold was the property of the supply company and that the outstanding mortgage against the leasehold amounted to $92,000 as of September, 1916. In January, 1918, additional capital was needed because of the expansion of the business as the world's largest retail dealers in automobile supplies and accessories, operating in the cities of New York, Chicago, Kansas City, Pittsburg, Columbus, Minneapolis, Cincinnati, Philadelphia and Des Moines, and an agreement was made with one Leidesdorf to procure loans for the corporation up to $200,000. As security for repayment, plaintiff and defendants individually transferred to Leidesdorf 10,000 shares of the common stock of the corporation which they owned and delivered to him respective resignations as officers and directors of the corporation, signed in blank. Leidesdorf was, therefore, in virtual control of the corporation by his holding of the common voting stock and his ability to force plaintiff and defendants out of the corporation as officers and directors. During this period defendant Froehlich was president, resided in Chicago and attended to the business and affairs of

the western stores. Plaintiff Froehlich was vice-president, in charge of finances, spent all his time in the New York office and there performed the executive duties of president and apparently was such in fact if not in name. Defendant Mansbach was treasurer, his duties consisting mainly of traveling from one store to another about the country and he spent most of his time outside of New York city. About five weeks after the agreement with Leidesdorf, defendants were summarily recalled to New York by plaintiff and a demand made upon them by plaintiff and Mr. Jesse Epstein, the lawyer of the supply company, that pursuant to the instructions of Leidesdorf they must sever all connections with the company, cancel their contracts of employment, having four or five years to run at the rate of $15,000 a year, respectively, give title to their 10,000 shares of stock theretofore pledged with Leidesdorf and also all other common stock owned by them amounting to about 14,000 shares and agree not to go into the same business as that done by the supply company for a fixed time. For all this, Epstein stated that he had been authorized by Leidesdorf to pay defendants not to exceed $10,000, or $5,000 each, which was subsequently raised to $15,000, or $7,500 each. In further answer to the protest of defendants, Leidesdorf consented that the corporation pay defendants an additional $10,000, or $5,000 additional each, making $25,000 in all, or $12,500 each. It was represented to defendants that Leidesdorf was in full control of the situation, since he had their resignations and could force the company into bankruptcy and that defendants had no alternative but to accept his proposition, which they did. Thereupon the supply company, in writing, executed a general release to each of the defendants and specifically agreed to hold them jointly and severally free and harmless from any liability upon any note, guaranty, contract or obligation executed by them for the benefit or accommodation of the supply company. Defendants thus found themselves summarily forced from the corporation, having sur-rendered all except the $12,500 in cash. As bearing upon the effectiveness of the representations made to defendants that if they did not accede the corporation would be forced into bankruptcy and a receiver appointed and they would lose all, it must be borne in mind that both defendants had relied for many years upon the financial management of the plaintiff, and, therefore, were justified in giving weight to his concurrence in the statement of the foregoing consequences of refusal. The basis of this suit now arises. Immediately upon consummation of the foregoing written agreements it is the claim of plaintiff that he broached the subject of the Swetland notes and that, in answer to his query as

to how these were going to be taken care of, plaintiff demanded that these defendants use the $12,500 just received in payment thereof. Defendants protested that that was all they had left and thereupon plaintiff claims that he strongly urged the necessity for anticipating the payment of these nine notes even though they had a long time to run. Thereupon plaintiff claims the defendants made the oral agreement which is here sued upon, namely, that they would each bear one-third of what plaintiff would have to pay for the retirement of these nine notes, which aggregated $133,000 and which were retired by plaintiff by the payment of $87,600. Plaintiff claims that the reason for his insistence upon the necessity of the retirement of these notes long prior to their due date was because the accountants, in their report upon which the issue of preferred stock was floated by the Chicago bankers, showed a mortgage indebtedness upon the leasehold of from $85,000 to $92,000, whereas the real mortgage indebtedness was some $240,000 and that, if the payment of these nine notes should be anticipated, the mortgage indebtedness would be approximately what had been certified by the accountants. Plaintiff further claimed that the misstatement resulted from an honest mistake of bookkeeping but that he insisted that it must be cleared off. The defendants, on the other hand, emphatically deny that any such agreement was made; they urge that as these notes had many years to run and were payable by the supply company as primary obligor as between itself and the makers, and were in fact for the premises used by the supply company as the headquarters for its business, they partook of the nature of rent notes which could be and should be paid by the corporation from its current earnings, and that, therefore, there was no reason to anticipate the payment of these notes and that the accountant's statement was correct. Defendants, moreover, urge that when they had just obtained from the supply company an agreement to become the primary debtor on these notes, it was most improbable that they would, practically in the same breath, repudiate the advantage thus coming to them from this written undertaking of the supply company and would orally agree that each of them without regard to this assumption would become absolutely liable to pay to the plaintiff two-thirds of any amount which he should pay to anticipate by years the due dates of these nine notes. The primary issue in the cause, therefore, was whether or not such oral agreement was made.

We do not pass upon the question whether the verdict of the jury finding this agreement to have been made is against the

weight of the evidence because, in any event, there must be a new trial for prejudicial error arising as follows: While the plaintiff was permitted wide latitude in establishing the alleged oral agreement, the defendants were not permitted to introduce evidence bearing heavily against the probabilities that such an agreement had ever been made. One example is in itself sufficient to require a new trial. The learned trial court properly admitted in evidence the written agreement by which the Times Square Automobile Company, in consideration of the assignment to it of two certain leases, assumed all the obligations imposed upon the defendants under the said leases and assumed the payment of all obligations incurred by the plaintiff and defendants for the purpose of carrying out the terms of the leases and agreed to indemnify and hold them free and harmless, and also a like agreement by the supply company, but limited the admission in evidence of these papers simply to show the chain of circumstances or the history of the events and refused the direct request of the defendants to permit the consideration by the jury of these written assumptions as bearing on the probability of whether or not the agreement constituting the main issue in the cause had in fact been made. In answer to a direct request from one of the jurors as to whether the jury might consider these documents as bearing on the main issue, they were instructed by the court that they might not do so. Chamberlayne, in his standard work on the Modern Law of Evidence (Vol. 1, § 378, p. 502), says: " He [referring to the right of a party to test the case of his adversary] may, in general, attack his opponent's affirmative case in one of three ways: *   *   *   (3) he may attack the credibility of his opponent's witnesses or seek to establish the improbability of their story."

It follows that the judgment and order appealed from should be reversed and a new trial ordered, with costs to appellants to abide the event.

Dowling, P. J., McAvoy, Martin and O'Malley, JJ., concur.

Judgment and order reversed and a new trial ordered, with costs to the appellants to abide the event.